**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **HANCOCK WHITNEY BANK,** | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **CASE NO.  4:25-cv-3555** |
| | ) | |
| **KEIRAN INVESTMENTS LLC** | ) | |
| **and KARACALLA JACKSON** | ) | |
| **Defendants** | ) | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Hancock Whitney Bank ("HWB" or "Bank" or "Lender") submits this Original Complaint against Defendants Keiran Investments LLC ("KI" or "Borrower") and Karacalla Jackson ("KJ"; KI and KJ are hereinafter referred to cumulatively as the "Obligors"), and in support thereof states as follows:

### I.      Introduction

1.      This is a simple breach of contract action in which Defendant KI has failed to make agreed payments to HWB pursuant to the terms of: (i) a Promissory Note dated April 5, 2024 in the original principal amount of $100,000.00 (the "PN1" [1]; Loan #xxx0505) that matured on April 5, 2025, (ii) a Promissory Note dated July 8, 2024 in the original principal amount of $592,500.00 (the "PN2"[2]; Loan #xxx1305) that has been in payment default for more than eight (8) months, and (iii) a Promissory Note dated January 17, 2025 in the original principal amount of $53,159.62 (the "PN3"[3]; Loan #xxx8332).

---

[1] A true and correct copy of the PN1 executed by KI is attached hereto as Exhibit 1 and incorporated herein by reference.

[2] A true and correct copy of the PN2 executed by KI is attached hereto as Exhibit 2  and incorporated herein by reference.

[3] A true and correct copy of the PN3 executed by KI is attached hereto as Exhibit 3  and incorporated herein by reference.  The PN1, the PN2, and the PN3 are cumulatively referred to herein as the "Notes".

2.      In addition, KJ, the owner/director of KI and guarantor of the indebtedness owed by KI to HWB pursuant to a Commercial Guaranty dated April 17, 2024 (the "CG")[4], has likewise failed to pay her debt owed to HWB.

## II.    Parties

3.      Plaintiff HWB is a Mississippi State chartered bank with its principal office in Gulfport, Mississippi.

4.      Defendant KI is a Texas limited liability company with its principal office in San Antonio, Texas.  On information and belief, and pursuant to the most recently filed Public Information Report filed by KI, Defendant KJ is the only interested party in KI.  KI may be served with process through its registered agent for service of process, KJ, at 7703 William Bonney, San Antonio, TX 78254, or wherever she may be found.

5.      Defendant KJ is a citizen of Texas and may be served with process at her address at 2026 White Lodge, San Antonio, TX 78254, or wherever she may be found.

## III.    Jurisdiction and Venue

6.      This Court has jurisdiction over this suit pursuant to 28 U.S.C. § 1332(a)(1) based upon diversity of citizenship.  This controversy involves a dispute between citizens of different states, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

7.      Venue is proper in this Court pursuant to the mandatory venue clauses contained in the Notes and the CG, which call for "the laying of venue exclusively in any state or federal court in Texas located in the same judicial district as Harris County, Texas for any suit …" and further state that "[t]he foregoing [venue] provisions are intended to be mandatory and not permissive in nature, and Borrower [and Guarantor] acknowledges that Texas is a convenient forum and that any

---

[4] A true and correct copy of the CG executed by KJ is attached hereto as Exhibit 4 and incorporated herein by reference.

state or federal court in Texas located in the same judicial district as Harris County, Texas is a convenient venue." (Exhibit 1 at p.2; Exhibit 2 at p.3; Exhibit 3 at p.3; Exhibit 4 at p.3).

## IV.    Factual Background

### A.  The PN1

8.    On or about April 5, 2024, for value received, KI executed the PN1 in favor of HWB. (*See* Exhibit 1).

9.    Pursuant to the terms of the PN1, KI agreed to "pay this loan [PN1] in one payment of all outstanding principal plus all accrued unpaid interest on April 5, 2025. (Exhibit 1 at p.1).

10.    Despite its contractual agreement, KI failed to pay off the PN1 on April 5, 2025 and is in continued payment default of the PN1 as of the filing of this Complaint.

11.    Via letter dated June 16, 2025, HWB made demand for payment of the PN1, reminding KI and KJ that they were both liable for payment due under the PN1.[5]

12.    KI and KJ have failed to pay the PN1 as demanded.

13.    Pursuant to the terms of the PN1, "[i]f a payment is 10 days or more late, Borrower will be charged 5.000% of the unpaid portion of the regularly scheduled payment." (Exhibit 1 at pp.1-2).

14.    The PN1 also provides that "[u]pon default, including failure to pay upon final maturity, the interest rate on this Note [PN1] shall be increased to 18.000% per annum based on a year of 360 days." (*Id*. at p.2).

15.    In addition, the PN1 provides that "Lender may hire an attorney to help collect this Note if Borrower does not pay, and Borrower will pay Lender's reasonable attorneys' fees. Borrower will also pay Lender all other amounts Lender actually incurs as court costs … the reasonable costs actually expended for repossessing, storing, preparing for sale, and selling any security…" etc.

---

[5] A true and correct copy of the June 16, 2025 demand sent to KI and KJ is attached hereto as Exhibit 5 and incorporated herein by reference.

(*Id*.).

16.    As of the filing of this Complaint, Obligors have failed to pay the indebtedness due under the PN1.

17.    As of July 30, 2025, there is an outstanding principal balance due under the PN1 of $99,510.20, contractual accrued, unpaid interest of $3,843.67[6], outstanding late charges of $189.67, and outstanding attorney's fees and other collection costs.

**B.  The PN2**

18.    On or about July 8, 2024, for value received, KI executed the PN2 in favor of HWB.  (*See* Exhibit 2).

19.    Pursuant to the terms of the PN2, KI was required to make monthly payments of principal and interest on the 17th day of each month "commencing on September 17, 2024 … with the final unpaid balance of principal and interest due and payable on April 17, 2029."  (Exhibit 2 at p.1).

20.    Despite its contractual agreement, KI missed the required payment due on November 17, 2024 and has not made another payment since that time.

21.    Via letter dated June 16, 2025, HWB gave notice to KI and KJ of the payment default of the PN2 and gave notice of intent to accelerate the indebtedness if the payment default was not cured.   (*See* Exhibit 5).

22.    KI and KJ did not cure the default of the PN2, and by letter dated July 17, 2025, HWB gave notice of acceleration of the indebtedness owing under the PN2.[7]

23.    Pursuant to the terms of the PN2, "[i]f  a payment is 10 or more days late, Borrower will be charged 5.000% of the unpaid portion of the regularly scheduled payment." (Exhibit 2 at p.2).

---

[6] Interest on the PN1 is currently accruing at the default rate of 18.0%, or $49.7551 *per diem* since July 8, 2025.

[7] A true and correct copy of the July 17, 2025 demand sent to KI and KJ is attached hereto as Exhibit 6 and incorporated herein by reference.

24.    The PN2 also provides that "[u]pon default … the interest rate on this Note [PN2] shall be increased to 18.000% per annum based on a year of 360 days." (*Id*.).

25.    In addition, the PN2 provides that "Lender may hire an attorney to help collect this Note if Borrower does not pay, and Borrower will pay Lender's reasonable attorneys' fees.  Borrower will also pay Lender all other amounts Lender actually incurs as court costs … the reasonable costs actually expended for repossessing, storing, preparing for sale, and selling any security…" etc. (*Id*.).

26.    As of the filing of this Complaint, Obligors have failed to pay the indebtedness due under the PN2.

27.    As of July 30, 2025, there is an outstanding principal balance due under the PN2 of $574,817.91, contractual accrued, unpaid interest of $36,274.77[8], and outstanding attorney's fees and other collection costs.

**C.  The PN3**

28.    On or about January 17, 2025, for value received, KI executed the PN3 in favor of HWB. (*See* Exhibit 3).

29.    Pursuant to the terms of the PN3, KI was required to make monthly payments in the amount of $1,087.58 on the 17th day of each month, with the "first payment … due February 17, 2025…." (Exhibit 3 at p.1).

30.    Despite its contractual agreement, KI missed the required payment due on May 17, 2025 and has not made a payment on the PN3 since then.

31.    Via letter dated June 16, 2025, HWB gave notice to KI and KJ of the payment default of the PN3 and gave notice of intent to accelerate the indebtedness if the payment default was not

---

[8] Interest on the PN2 is currently accruing at the default rate of 18.0%, or $287.408995 *per diem* since July 8, 2025.

cured.   (*See* Exhibit 5).

32.     KI and KJ did not cure the default of the PN3, and by letter dated July 17, 2025, HWB gave notice of acceleration of the indebtedness owing under the PN3.  (*See* Exhibit 6).

33.     Pursuant to the terms of the PN3, "[i]f  a payment is 10 or more days late, Borrower will be charged 5.000% of the unpaid portion of the regularly scheduled payment." (Exhibit 3 at p.2).

34.     The PN3 also provides that "[u]pon default … the interest rate on this Note [PN3] shall be increased to 18.000% per annum based on a year of 360 days."  (*Id*.).

35.     In addition, the PN3 provides that "Lender may hire an attorney to help collect this Note if Borrower does not pay, and Borrower will pay Lender's reasonable attorneys' fees.  Borrower will also pay Lender all other amounts Lender actually incurs as court costs …." etc. (*Id*.).

36.     As of the filing of this Complaint, Obligors have failed to pay the indebtedness due under the PN3.

37.     As of July 30, 2025, there is an outstanding principal balance due under the PN3 of $50,910.47, contractual accrued, unpaid interest of $1,614.65[9], outstanding late charges of $108.76, and outstanding attorney's fees and other collection costs.

**D.  The CG**

38.     On or about April 17, 2024, KJ executed the CG, pursuant to which, "[f]or good and valuable consideration, Guarantor [KJ] absolutely and unconditionally guarantee[d] full and punctual payment and satisfaction of the Indebtedness of Borrower to Lender…."  (Exhibit 4 at p.1).

39.     "Indebtedness" as defined by the CG "means all of the principle amount outstanding from time to time and at any one or more times, accrued unpaid interest thereon and all collection costs

---

[9] Interest on the PN3 is currently accruing at the default rate of 18.0%, or $25.455235 *per diem* since July 8, 2025.

and legal expenses related thereto permitted by law, Lender's reasonable attorneys' fees, arising from any and all debts, liabilities and obligations of every nature or form, now existing or hereafter arising or acquired, that Borrower individually or collectively or interchangeably with others, owes or will owe Lender." (*Id*.).

40.     Pursuant to the express terms of the CG, KJ also agreed "to pay upon demand all of Lender's costs and expenses, including Lender's reasonable attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Guaranty. … Costs and expenses include Lender's reasonable attorneys' fees and legal expenses whether or not there is a lawsuit, including Lender's reasonable attorneys' fees and legal expenses for bankruptcy proceedings … appeals, and any anticipated post-judgment collection services." (*Id*. at p.2)

41.     Despite KJ's knowledge that KI's indebtedness to HWB is in default and has been accelerated, and despite demand having been made on KJ as guarantor of the KI indebtedness due under the Notes, KJ has failed and refused to pay her obligations due under the CG.

**E.  The CSA1**

42.     In conjunction with Loan #xxx0505, KI also executed a Commercial Security Agreement dated April 5, 2024.[10]

43.     Pursuant to the CSA1, "[f]or valuable consideration, Grantor [KI] grants to Lender a security interest in the Collateral to secure the Indebtedness …." (Exhibit 7 at p.1).

44.     "Collateral" as defined by the CSA1 means "All Equipment; whether any of the foregoing is owned now or acquired later …" as well as proceeds of such equipment and "accounts … and all other rights, arising out of a sale, lease, consignment, or other disposition of any of the property described in this Collateral section." (*Id*.).

---

[10] A true and correct copy of the Commercial Security Agreement dated April 5, 2024 executed by KI (hereinafter referred to as the "CSA1") is attached hereto as Exhibit 7 and incorporated herein by reference.

45.    "Indebtedness" as defined by the CSA1 "means any amounts Grantor [KI] and/or Borrower, or any one of them, owe to Lender, whether owed now or later …." (*Id*. at p.5).

46.    Pursuant to the terms of the CSA1, a default of the CSA1 occurs if "Grantor fails to make any payment when due under the Indebtedness." (*Id*. at p. 2).

47.    In the event of a default, the CSA1 provides that in addition to having "all the rights of a secured party under the Uniform Commercial Code," "Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Grantor." (*Id*. at p.3).

48.    The CSA1 also provides that:

> Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Indebtedness.  The receiver may serve without bond if permitted by law.  (*Id*.).

49.    The CSA1 further provides that KI will pay:

> all of Lender's costs and expenses, including Lender's reasonable attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement.  Lender may hire or pay someone else to help enforce this Agreement, and Grantor [KI] shall pay the costs and expenses of such enforcement.  Costs and expenses include Lender's reasonable attorneys' fees and legal expenses whether or not there is a lawsuit, including Lender's reasonable attorneys' fees and legal expenses for bankruptcy proceedings … appeals, and any anticipated post-judgment services.  Grantor also shall pay all court costs and such additional fees as may be directed by the court.  (*Id*. at p.4).

## F.  The CSA2

50.    In conjunction with Loan #xxx1305, KJ executed a Commercial Security Agreement dated December 17, 2024[11].

---

[11] A true and correct copy of the Commercial Security Agreement dated December 17, 2024 executed by KJ (hereinafter referred to as the "CSA2") is attached hereto as Exhibit 8 and incorporated herein by reference.

51.     Pursuant to the CSA2, "[f]or valuable consideration, Grantor [KI] grants to Lender a security interest in the Collateral to secure the Indebtedness …."  (Exhibit 8 at p.1).

52.     "Collateral" as defined by the CSA2 "means the following described property …

> 2025 Gall DP (VIN 3DG1T4225SG001165)
> 2025 Gall DP (VIN 3DG1T4227SG001166)
> 2025 Gall DP (VIN 3DG1T4229SG001167)
> 2025 Gall DP (VIN 3DG1T4220SG001168)
> 2025 Gall DP (VIN 3DG1T4222SG001169)
> 2025 Gall DP (VIN 3DG1T4229SG001170)
> 2025 Gall DP (VIN 3DG1T4220SG001171)
> 2025 Gall DP (VIN 3DG1T4222SG001172)
> 2025 Gall DP (VIN 3DG1T4224SG001173)
> 2025 Gall DP (VIN 3DG1T422XSG001159)
> 2025 Gall DP (VIN 3DG1T4226SG001160)
> 2025 Gall DP (VIN 3DG1T4228SG001161)
> 2025 Gall DP (VIN 3DG1T422XSG001162)
> 2025 Gall DP (VIN 3DG1T4221SG001163)
> 2025 Gall DP (VIN 3DG1T4223SG001164)"

as well as proceeds of such equipment, "[a]ll accounts … and all other rights, arising out of a sale, lease, consignment, or other disposition of any of the property described in this Collateral section" and "[a]ll records and data relating to any of the property described in this Collateral section …." (*Id.*).

53.     "Indebtedness" as defined by the CSA2 "means any amounts Grantor [KI] and/or Borrower, or any one of them, owe to Lender, whether owed now or later …."  (*Id.* at p.5).

54.     Pursuant to the terms of the CSA2, a default of the CSA1 occurs if "Grantor fails to make any payment when due under the Indebtedness."  (*Id.* at p. 3).

55.     In the event of a default, the CSA2 provides that in addition to having "all the rights of a secured party under the Uniform Commercial Code," "Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Grantor."  (*Id.*).

56.    The CSA2 also provides that:

> Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Indebtedness.  The receiver may serve without bond if permitted by law.  (*Id*.).

57.    The CS21 further provides that KI will pay:

> all of Lender's costs and expenses, including Lender's reasonable attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement.  Lender may hire or pay someone else to help enforce this Agreement, and Grantor [KI] shall pay the costs and expenses of such enforcement.  Costs and expenses include Lender's reasonable attorneys' fees and legal expenses whether or not there is a lawsuit, including Lender's reasonable attorneys' fees and legal expenses for bankruptcy proceedings … appeals, and any anticipated post-judgment services.  Grantor also shall pay all court costs and such additional fees as may be directed by the court.  (*Id*. at p.4).

58.    All conditions precedent to the filing of this Complaint and the recovery of the damages requested herein have occurred or have been performed.

## V.    Claims

59.    HWB refers to and incorporates the allegations of the preceding paragraphs as though fully set forth herein.

### A.  Breach of Contracts Against KI

60.    The PN1, the PN2, and the PN3 executed by KI constitute valid, enforceable contracts between HWB and KI.

61.    HWB loaned/advanced substantial sums of money to KI pursuant to the PN1, the PN2, and the PN3, but KI has failed to repay the debt owed to HWB as contractually agreed, despite demand having been made.

62.    KI's failures to pay the amounts due and owing to HWB under the PN1, the PN2, and the PN3 constitute breaches of the PN1, the PN2, and the PN3 and have caused significant financial

injury to HWB.

**B.  Breach of Contract Against KJ**

63.      The CG executed by KJ constitutes a valid, enforceable contract between HWB and KJ.

64.      Despite demand having been made on KJ for payment of the amounts owed by KI to HWB pursuant to the PN1, the PN2, and the PN3, KJ has failed to make payment to HWB as agreed under the CG.

65.      KJ's failures to pay the amounts due and owing to HWB under the PN1, the PN2, and the PN3, and hence pursuant to the CG, constitutes a breach of the CG and has caused significant financial injury to HWB.

**C.  Foreclosure of HWB's Security Interests**

66.      The CSA1 and the CSA2 executed by KI constitute valid, enforceable contracts between KI and HWB.

67.      Because of the payment defaults under the CSA1 and the CSA2 by reason of KI's failures to pay the indebtedness owed under the PN1, the PN2, and the PN3, HWB is entitled, as a matter of law, and pursuant to the terms of the CSA1 and the CSA2, to foreclose its security interests in the collateral pledged by KI pursuant to the CSA1 and the CSA2.

**D.  Attorney's Fees Against KI and KJ**

68.      Because of Defendants' failures to pay the amounts due and owing under the PN1, the PN2, the PN3, the CG, the CSA1, and the CSA2, HWB has found it necessary to retain legal counsel in order to seek to enforce the terms of those contracts.

69.      Pursuant to the express terms of the various loan agreements, KI and KJ are obligated to pay HWB's " reasonable attorneys' fees" and costs.  (Exhibit 1 at p.2; Exhibit 2 at p.3; Exhibit 3 at p.2; Exhibit 4 at p.3; Exhibit 7 at p.4; Exhibit 8 at p.4).

70.     In addition, pursuant to TEX. CIV. PRAC. & REM. CODE §38.001, *et. seq.*, HWB is entitled to recover its reasonable attorney's fees and other legal expenses from Defendants.

### VI.     Prayer for Relief

71.     Plaintiff Hancock Whitney Bank respectfully prays that Keiran Investments LLC and Karacalla Jackson be cited to appear and answer herein, and that final judgment be entered in favor of HWB and against KI and KJ jointly and severally as follows:

a.     for the entire unpaid indebtedness owing under the PN1, the PN2, the PN3, and the CG, together with all accrued, unpaid interest thereon until the time of judgment;

b.     for the reasonable attorney's fees and costs incurred by HWB in enforcing the PN1, the PN2, the PN3, the CG, the CSA1, and the CSA2;

c.     for post-judgment interest on the foregoing awards at the maximum rate allowed by law and pursuant to the loan documents;

d.     for an order of foreclosure against the collateral pledged by KI and KJ; and

e.     for such other and further relief, at law or in equity, to which HWB may show itself justly entitled.

Respectfully submitted,

/s/ Neale Shields
Neale Shields
**Attorney-In-Charge for**
**Plaintiff Hancock Whitney Bank**
State Bar No. 24013499
Fed Bar No. 25383
Law Office of Neale Shields
P.O. Box 397
New Summerfield, Texas 75780
Telephone:  (713) 504-4182
Email:  harv99atty@att.net